**UNITED PARCEL SERVICE, INC., Plaintiff,**

v.

**CHADWICK'S OF BOSTON, LTD., Defendant.**

**Civ. A. No. 93–11240–REK.**

United States District Court, D. Massachusetts.

Oct. 4, 1995.

---

John D. Hughes, Kim E. Perry, Hutchins, Wheeler & Dittmar, Boston, MA, for plaintiff.

Douglas H. Meal, Richard D. Batchelder, Jr., Amy L. Freeman, Ropes & Gray, Boston, MA, for defendant.

## OPINION AND ORDERS

KEETON, District Judge.

### I.

This case and the parties to the larger controversy of which it is only one part are

caught in a jurisdictional, procedural, appellate, and administrative quagmire. A prudential purpose of this Opinion and Orders is to invoke whatever authority this court has to make its Declaratory Orders immediately appealable, or, if that is not possible, to invite the Interstate Commerce Commission ("ICC") to accept this court's Declaratory Orders as an effective form of judicial review of material parts of the ICC's decision of June 16, 1995.

The larger purposes are: (1) to rescue the case from sinking deeper into thick slurries of unplumbed depth, (2) to bring the parties out, even if kicking and screaming but preferably with their full cooperation, and (3) then to proceed to a "just, speedy, and inexpensive determination," Fed.R.Civ.P. 1, of their entire controversy.

Contributing to the quagmire is the unsettled state of the law of several exotic species of agency and judicial decisionmaking that are involved in proceedings now pending or in prospect before the ICC, this court, and different United States Courts of Appeals.

Before turning to any of these questions, however, I begin with an explanation of the background circumstances.

## II.

Clarification may contribute to the rescue effort—clarification about the kind or kinds of decisionmaking that the parties are seeking from the ICC and this court, or that either forum might have the jurisdiction and authority to undertake on its own initiative. *See Charlton Memorial Hosp. v. Sullivan,* 816 F.Supp. 50 (D.Mass.1993). I have invited the parties and their attorneys to help fashion an Order Regulating Proceedings in this case, adapted from that proposed to the parties in *Charlton* and aimed at preparing this case for an expedited "trial." Consultations regarding an Order Regulating Proceedings will continue during the next few weeks. During this same period of time, the parties will be encouraged to use the services of another judge of this court under this court's Alternative Dispute Resolution Program, administered by Senior Judge David Mazzone. Mediation could, of course, lead to an agreed disposition of the entire controversy sooner and with far lower commitment of resources of the parties and the public than could ever be accomplished by litigation in any or all of the forums that could potentially exercise jurisdiction over this matter.

## III.

As set forth in more detail in the court's Memorandum and Order dated June 23, 1994 (Docket No. 39), UPS seeks in this action to recover approximately $3 million in alleged shipping undercharges for the period February 1991 to December 1992. UPS claims that this amount represents the difference between the lower shipping charges that Chadwick's actually paid for delivery of packages during that period and the higher charges that Chadwick's should have paid. Under UPS's tariff filed with the ICC, lower rates applied to "COMMERCIAL DELIVERY SERVICE" as defined by item 1000–D of the tariff, and higher rates applied to "RESIDENTIAL DELIVERY SERVICE" as defined in item 1005 of the tariff.

The difference between these two types of service primarily relates to the destination of the package. COMMERCIAL DELIVERY SERVICE rates apply to the "delivery of packages to a commercial location (consignee's place of business or employment)...." (Item 1000–D, p. 4). RESIDENTIAL DELIVERY SERVICE rates apply to the "delivery of packages to a residence (the location where the consignee lives)...." (Item 1005, p. 6) Note 4 of both items 1000–D and 1005 provides that "[i]f the delivery location could be construed as both residential [item 1005] or [sic] commercial [item 1000–D], apply the rates in Item 1000."

Chadwick's asserts at least four defenses to UPS's claim: (1) that the deliveries were made under an agreement between UPS and Chadwick's that the lower, "commercial" rates would apply to all shipments (the "contract carriage" issue); (2) that the higher, "residential" rates were unreasonable (the "rate reasonableness" issue); (3) that either all of the deliveries could be construed under UPS's tariff to have gone to "commercial" locations or that UPS cannot establish which deliveries (or what percentage of the deliver-

ies) were made to "commercial" versus "residential" locations (the "rate applicability" issue); and (4) that the tariff rates are invalid because of filing irregularities (the "tariff validity" issue). By motion filed November 22, 1993 (Docket No. 13), Chadwick's requested that the court "suspend" the proceedings in this case and, in deference to the ICC's primary jurisdiction over such matters, "refer" to the ICC the following four issues (corresponding to the four defenses):

whether ... UPS moved Chadwick's packages pursuant to UPS's contract carriage or its common carriage authority;

whether UPS filed rates for common carriage were reasonable as applied to the shipments in question;

the correct interpretation of UPS's filed tariffs and their correct application to the shipments in questions; and

the effect of UPS's tariff filing practices on the enforceability of UPS's filed rates.

For reasons set forth in its June 23, 1994 Memorandum and Order, the court denied Chadwick's motion. Chadwick's sought reconsideration in a motion filed November 10, 1994 (Docket No. 79). The court denied this motion at a conference held on December 1, 1994, but left the door open to a new motion for stay by either party if either had first initiated proceedings before the ICC with respect the above issues.

On or about January 9, 1995, Chadwick's filed with the ICC a Petition for a Declaratory Order in which it raised these four issues. Chadwick's then filed in this court a motion to stay proceedings in this matter "pending the resolution of Chadwick's Petition for a Declaratory Order ... to determine issues relating to contract carriage, rate reasonableness, tariff applicability and tariff validity...." (Docket No. 99). UPS again opposed Chadwick's motion to stay in this court, and it filed with the ICC a motion to dismiss Chadwick's petition on jurisdictional grounds.

By order of reference dated April 19, 1995 (Docket No. 120), this court referred Chadwick's new motion for a stay to United States Magistrate Judge Karol. Judge Karol held a hearing on the motion on April 28, 1995.

Both parties made supplemental filings during the third week of May addressing issues raised at the hearing, and Judge Karol took the matter under advisement.

On June 16, 1995, while Chadwick's motion to stay was still pending before Judge Karol, the ICC issued a written decision denying UPS's motion to dismiss the petition and addressing, to some extent, the merits of the issues that Chadwick's had raised. Regarding tariff applicability, the ICC concluded that its "unique expertise" was not required to resolve questions about the distinction between "commercial" and "residential" delivery service. Rather, the ICC determined that this court was in a better position to address this aspect, at least, of the "rate applicability" issue.

Chadwick's filed a petition to reopen the ICC's proceedings. This petition, which had the effect of tolling the period for Chadwick's to file an appeal of the ICC's decision to a court of appeals, is still pending.

Judge Karol, after inviting further briefing and argument from the parties concerning the effect of the ICC's June 16, 1995 decision on Chadwick's pending motion for stay, issued a decision on September 12, 1995 (Docket No. 169), dismissing as moot Chadwick's motion to stay proceedings in this court.

## IV.

Chadwick's has filed an objection to and motion for reconsideration (Docket No. 182, filed September 26, 1995) of the Magistrate Judge's decision. The objection and motion for reconsideration are now pending before this court. Chadwick's identifies two grounds for its contention that this court should vacate Judge Karol's order.

First, Chadwick's contends that its motion for stay can not be moot in view of the complex relationships among proceedings in this court and before the ICC. Second, Chadwick's now argues that even though its motion for stay and supporting memorandum argued that a stay was "required" by federal statute, it was also asking the court for a discretionary stay of proceedings. Chadwick's adds that Judge Karol's order addressed only the issue of a mandatory stay so

that the issue of a discretionary stay is still open and must be decided rather than being dismissed as moot.

██ With respect to Chadwick's first argument, my inclination, which I acknowledge has been reached without tedious exploration of all the nuances of the procedural argument, is that Judge Karol's decision could appropriately be affirmed as not based upon any erroneous finding of fact, error of law, or abuse of discretion. Rule 2 of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts directs that:

> A judge of the court shall reconsider the magistrate's order and set aside any portion thereof found to be *clearly erroneous in fact or contrary to law.* The judge may also reconsider any matter sua sponte on the same basis.

Rule 2, Rules for United States Magistrates in the United States District Court for the District of Massachusetts (emphasis added); *see also* 28 U.S.C. § 636(b)(1) ("A judge of the court may reconsider any pretrial matter ... where it has been shown that the magistrate's order is clearly erroneous or contrary to law."); Fed.R.Civ.P. 72 ("The district judge to whom the case is assigned shall ... modify or set aside any portion of the magistrate judge's order found to be clearly erroneous or contrary to law.").

Precedents also suggest what may be regarded as a third ground for setting aside a Magistrate Judge's order—that making the order was an "abuse of discretion." *See, e.g., Ellison v. American National Red Cross,* 151 F.R.D. 8, 10 (D.N.H.1993) ("the court concludes that under section 636(b)(1)(A) it may reconsider the magistrate judge's order only if the magistrate judge abused his discretion...."); *Geophysical Systems Corp. v. Raytheon Co.,* 117 F.R.D. 646, 647 (C.D.Cal. 1987) ("[T]he standard of review in most instances is not the explicit statutory standard, but the clearly implicit standard of abuse of discretion.").

Although Chadwick's is correct in pointing out the extreme complexity of issues, the unusual circumstances of this case, and the relationships among past and future proceedings before the ICC and this court, I con-

clude that Chadwick's has failed to meet its burden of showing that Judge Karol's order dismissing the motion to stay as moot was clearly erroneous in fact, contrary to law, or otherwise an abuse of discretion. The ICC's decision of June 16, 1995 says that it is *"effective* on the date of service." (emphasis added) This statement implies at least some level of finality.

To determine Chadwick's present objection and motion for reconsideration, I need not determine whether the ICC decision is in some respect binding on this court at this time. Regardless of what the answer to that question may be, I conclude that, at the least, the ICC decision of June 16, 1995 introduces into the complex relationships a materially different circumstance and thus moots arguments and motions based on circumstances as they existed before June 16, 1995. Judge Karol's decision was not clearly erroneous if supportable as a determination that the motion for stay, as presented when it was filed, had been mooted by intervening material developments.

██ Chadwick's second contention is that it is entitled to a decision on the motion rather than dismissal because it also asked for, and deserves, a discretionary stay. I conclude for two independent reasons that this contention should be rejected. First, it is well established in the First Circuit that a contention presented in only a cursory way is not preserved for decision on the merits. *See, e.g., New Hampshire Motor Transport Association v. Town of Plaistow,* 67 F.3d 326, 331 (1st Cir.1995), *citing United States v. Zannino,* 895 F.2d 1, 17 (1st Cir.1990), *cert. denied,* 494 U.S. 1082, 110 S.Ct. 1814, 108 L.Ed.2d 944 (1990). Chadwick's can point to only a few sentences in its voluminous motion and supporting memorandum in which it implied that it was requesting a discretionary stay.

██ Second, even considering the matter entirely de novo, and independently of Judge Karol's decision and recommendations, I conclude that Chadwick's motion for stay is without merit, on both mandatory and discretionary grounds. For all the reasons ex-

plained in detail in this Opinion, the least appropriate action this court could take at this time would be to stay proceedings here, thus allowing this case to sink deeper into the quagmire while tactics of the parties and their counsel magnify further the ongoing confusion of issues, delay of outcome, and waste of public and private resources.

In an idiom less familiar in courts than among regulators and those regulated, this dispute falls in a category for which the time has come to "de-hassle" wherever hassle is occurring. Since no other entity appears ready to start the process in this case, it seems appropriate for this court to do so in circumstances as compelling as they are here.

My rulings are explicitly designed to put to rest, if it is within my authority to do so, all past and present requests for stay of proceedings in this court. Any order less conclusive would allow Chadwick's insistence on pressing and preserving its contentions regarding a stay in this court to become yet another classic illustration of the wasteful skirmishing ongoing between the parties in this case.

## V.

■ In its decision of June 16, 1995, the ICC said:

On the matter of tariff applicability, we do not believe that the Commission's unique expertise is required to apply or interpret the distinction between "residential" and "commercial" delivery service. Nor do we believe that the involved terms create any ambiguity that needs to be clarified in order to resolve this billing dispute. We cannot resolve this billing dispute on the record before us. UPS has not presented detailed information or evidence on how it determined which of the shipments it handled for Chadwick's should now be charged the residential rate or how the balance due bills were computed. We believe that the court is in a better position to resolve this question. A trial date is set for June 26, and a court ruling can be expected before the Commission could issue a procedural schedule and gather additional evidence to resolve this question.

*Chadwick's of Boston, Ltd.,* I.C.C. Decision No. 41531, slip op. at 3–4, 1995 WL 366724 (June 16, 1995) (footnote omitted).

Even if it is true that the "Commission's unique expertise is [not] *required* to apply or interpret the distinction between 'residential' and 'commercial' delivery service," *id.* (emphasis added), it is my view that the Commission does have expertise that is likely to be relevant to interpreting and applying the relevant distinction.

As stated in the tariff, the distinction is between delivery to a "commercial location" and delivery to a "residence." Both terms are only parenthetically defined in the tariff, itself. A "residence" is "where the consignee lives," and a "commercial location" is the "consignee's place of business or employment." These brief definitions provide little guidance for the application of these terms to this case.

In deciding how the distinction between delivery to a "commercial location" and delivery to a "residence" applies to this case, and what consequences follow with respect to each of the disputed charges for different shipments, a decisionmaker (whether the ICC, a court, or a court and jury) may have to resolve a dispute about which to choose, among competing evaluative inferences from the historical facts about exactly what deliveries were made, in what circumstances, and to what destinations.

As the Commission has pointed out, "UPS has not presented detailed information or evidence on how it determined which of the shipments it handled for Chadwick's should now be charged the residential rate or how the balance due bills were computed." Indeed, neither Chadwick's nor UPS has presented such information, before either the ICC or this court. Thus, because no satisfactory proffer of evidence of historical facts has yet been made by either party, it is not even clear whether there will be any genuine dispute of material historical fact. In any event, whether or not a genuine dispute exists about material historical facts, it is highly likely that a genuine dispute will exist about the evaluative inferences that might

reasonably be drawn from the historical facts.

The Commission would be better qualified to make these evaluative choices. Its expertise would be helpful, even if not "required." Moreover, and perhaps even more significantly, the choice might reasonably be influenced by issues of transportation policy. With respect to such matters, the Commission is certainly a more appropriate decisionmaker than a United States district court. *See, e.g., Delta Traffic Service Inc. v. Transtop, Inc.,* 902 F.2d 101, 104 (1st Cir.1990). The Commission's decision of June 16, 1995, however, takes the position that this court should decide at least a part of the dispute over rate applicability in this case, and should do so before the ICC takes further action.

For the reasons explained above, I have concluded that deciding tariff applicability may require that some decisionmaker resolve genuinely disputed fact questions. Before that can be done, some (perhaps a different) decisionmaker must determine any legal issues that frame in an understandable way the fact questions that are material, under the applicable legal test. In other words, the fact questions cannot be decided by a finder of facts before the questions of fact have been framed precisely for the finder of facts. This is true regardless of whether that finder of facts is the ICC, this court, or a jury.

Another significant factor is that the decision regarding interpretation of the tariff and its application to the facts of this case may involve mixed-law-fact issues. These issues may involve intertwining of law and fact in such a way that the court could not find the material facts or ask a jury to do so without first having framed the precise legal issues involved. Such a determination of the precise framing of the factual element(s) of the mixed-law-fact issues may require guidance from the ICC.

It is my present view, based on the record now before me, that decision of the rate applicability issue will require, as steps of reasoned decision making, a decision on the following matters as premises of a final determination:

(1) Can a decisionmaker make the decision regarding rate applicability as a matter of law in the circumstances of the present case or must the decisionmaker instead decide either (a) one or more disputable questions of historical fact or (b) one or more disputable questions about what evaluative inferences are to be drawn from historical facts, even if all relevant historical facts are undisputed?

(2) If the decisionmaker must either (a) resolve a dispute of historical fact or (b) resolve a dispute about what inferences are to be drawn from historical facts, is this decision, in the circumstances of this case, one within the "primary jurisdiction" of the ICC?

It is important to bear in mind as these questions are considered that the doctrine of primary jurisdiction does not involve a question about jurisdiction in an ordinary, bright-line categorical sense, under which the answer to the question must be YES or NO. Rather, "[t]he doctrine of primary jurisdiction is a flexible tool for the allocation of business between court and agency. . . ." *Locust Cartage Co. v. Transamerican Freight Lines, Inc.,* 430 F.2d 334, 340 n. 5 (1st Cir.1970), *cert. denied,* 400 U.S. 964, 91 S.Ct. 365, 27 L.Ed.2d 383 (1971). Primary jurisdiction is determined by prudential, rather than bright-line categorical, legal grounds.

Thus, the second question above, stated another way, is whether the issue is one within the ICC's primary jurisdiction because the determination of the inferences to be drawn, in the circumstances of this case, either (a) involves prudential considerations to which the Commission's expertise is relevant, or (b) involves "issues of transportation policy that ought to be considered by [the ICC] in the interests of a uniform and expert administration of the regulatory scheme laid down by the [governing statutes.]" *United States v. Western Pacific R.R.,* 352 U.S. 59, 65, 77 S.Ct. 161, 166, 1 L.Ed.2d 126 (1956).

## VI.

Also pending before the court is Chadwick's recently filed motion for summary judgment (Docket No. 163, filed August

24, 1995). In this motion, Chadwick's asserts that this court can decide this entire dispute by ruling that, as a matter of law, UPS's claims are without merit. Given my findings and conclusions expressed above, I conclude that summary judgment is not appropriate. Indeed, an essential premise of Chadwick's motion for summary judgment is that the entire issue of rate applicability must be decided by this court. I conclude instead that this court lacks authority, or at least on prudential grounds should not exercise authority, to decide. Instead, this court should recognize that the ICC has primary jurisdiction. *Delta Traffic Service Inc.* 902 F.2d at 103.

It is ironic that Chadwick's has asked this court to make a ruling in favor of its summary judgment motion, and thus have the court decide all material issues as matters of law are decided. In contrast, all along Chadwick's has been arguing that this court should defer to the ICC's primary jurisdiction. The two choices are mutually exclusive. Of course, Chadwick's is permitted to argue in court in the alternative. But when it does so, the court cannot rule both ways. I conclude, for reasons stated above, that this court should defer to the ICC's primary jurisdiction and deny Chadwick's motion for summary judgment.

Independently, there are other cogent reasons for denying Chadwick's motion for summary judgment. First, as explained above, Chadwick's submission falls short of showing that there is no material dispute of historical facts. Second, as explained above, even if it were possible to determine that all material historical facts are undisputed, a problem would remain about evaluative inferences to be drawn in deciding whether the "commercial" or "residential" rate applies to all charges, or to some but not others, and, if so, which ones.

■ When historical facts are undisputed and the decisionmaker must nevertheless exercise discretion in choosing among evaluative inferences to decide whether some legal test is satisfied, the question is one for a finder of facts, and cannot be determined by a court as matters of law are decided. Thus, such a question ordinarily cannot be decided

on motion for summary judgment. As the First Circuit stated in *Springer v. Seaman*, 821 F.2d 871, 876 (1st Cir.1987), "Not only ordinary fact questions, but also evaluative applications of legal standards (such as the legal concept of 'foreseeability') to the facts are properly [questions for the factfinder]." (citation, internal quotation marks, and footnote omitted). This passage was also quoted with approval in a 1992 decision of the First Circuit in *Dedham Water Co. v. Cumberland Farms Dairy*, 972 F.2d 453, 457 (1st Cir. 1992), in relation to an issue of causation.

■ One special circumstance in which a trial court may proceed to choose among two or more permissible inferences from undisputed historical facts arises when the parties have submitted the case to the court in a fashion that constitutes a "case stated." This sometimes happens when the parties have filed cross motions for summary judgment and have come before the court for a hearing on a record in which neither party proffers any evidence, by affidavit or otherwise, beyond a stipulation or some other form of statement of undisputed historical facts. This exception for a "case stated" is fully explained in *United Paperworkers Int'l Union, Local 14, AFL–CIO–CLC v. International Paper Co.*, 64 F.3d 28 (1st Cir.1995). As explained, however, in a footnote to that opinion:

> Of course, the mere fact that the parties moved simultaneously for summary judgment does not ... render the customary standard of appellate review obsolete.... [Ordinarily], "the *nisi prius* court must consider each motion separately, drawing inferences against each movant in turn, and the court of appeals must engage in *de novo* review." [*Equal Employment Opportunity Comm'n v.*] *Steamship Clerks* [*Union*], 48 F.3d [594] at 603 n. 8 [ (1st Cir.1995) ] (citing *El Dia, Inc., v. Hernandez Colon*, 963 F.2d 488, 492 n. 4 (1st Cir.1992); *Griggs–Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir.1990)).

*Id.,* footnote 2.

I conclude that the exception explained in *United Paperworkers* for a "case stated" does not apply to this case. Instead, the rules stated in footnote 2 of that opinion

apply. Significantly, this case, unlike *United Paperworkers,* is scheduled for a jury trial. Moreover, the parties' submissions to this court do not manifest an intention to present the matter to this court as a "case stated," with no further opportunity to the parties to proffer evidence. In recent conferences with counsel, I have encouraged them to consider whether they can agree upon the facts and present a "case stated." They have declined.

Given these circumstances, a critical issue bearing upon rate applicability will need to be decided by the initial decisionmaker in the exercise of discretion, at least with respect to what evaluative inferences are to be drawn from historical facts, if not also with respect to resolving genuine disputes of historical fact. Also, the initial decisionmaker will need to consider whether the discretionary determination of inferences to be drawn, in the circumstances of this case, involves "issues of transportation policy" that ought to be considered by the ICC in its expert administration of the regulatory scheme laid down by the governing statutes. These are not matters to be decided by this court on motion for summary judgment.

If the issues regarding the distinction between COMMERCIAL DELIVERY SERVICE and RESIDENTIAL DELIVERY SERVICE and the consequences of its application to the circumstances of this case are issues that must be decided as matters of law are decided, then not only might it be inappropriate for a court to defer to the agency but also it would be important that the decisions be made, even at the level of first instance (whether in a district court or before the ICC), as decisions on matters of law are made. Thus, the issues would not be finally determined simply by orders of this court or the ICC. Orders in either forum on any issue of law would be reviewable on appeal to a higher forum, as decisions on matters of law are reviewed.

If, on the other hand, issues regarding this distinction involve any choice of inferences of the kind made by finders of fact, then the ICC does have relevant expertise and review is likely to be deferential, wherever it occurs. *See United States v. Western Pacific R.R. Co.,* 352 U.S. at 65–66, 77 S.Ct. at 165–166

("[W]here words in a tariff are used in a *peculiar or technical sense,* and where *extrinsic evidence is necessary* to determine their meaning or proper application, so that 'the enquiry is essentially one of fact and of discretion in technical matter,' then the issue of tariff application must first go to the Commission.") (emphasis added) (quoting *Great Northern Ry. Co. v. Merchants Elevator Co.,* 259 U.S. 285, 291, 42 S.Ct. 477, 479, 66 L.Ed. 943 (1922)).

Under the doctrine of primary jurisdiction, and for other reasons as well, I conclude that it is appropriate to defer to the ICC with respect to any decision on any matter as to which it has expertise. And, if either party contends that the UPS tariff uses "commercial location" and "residence" in a distinctive or technical sense or proposes to introduce extrinsic evidence such as expert testimony bearing on the interpretation and application of the tariff (as the parties assert they expect to do), the ICC has relevant expertise.

I recognize that the June 16, 1995 decision of the ICC may reasonably be understood as making determinations contrary to those expressed in the preceding paragraph. The matter is still before the ICC, however, on motion for reconsideration. If on reconsideration, the ICC reaches conclusions consistent with those I have reached, it will then be appropriate (pending ICC determinations) for me to proceed no further toward resolving the issue of rate applicability unless a higher court should order otherwise. If, on the other hand, after reconsideration, the ICC adheres to the position that at least some aspects of the issue of rate applicability must be resolved in this court before the ICC proceeds with its decisionmaking process, then a troubling impasse will be presented because of the conflict between my determination and that of the ICC. Each wishes to defer to the other.

### VII.

The applicable law presents additional unsettled issues about rights of either or both parties to appeal or to seek review. Included are unsettled issues with respect to appeal from any interlocutory order of either this court or the ICC.

I recognize that two circuits have determined that a trial court may, even retroactively, refer a matter to the ICC in the expectation that the trial court will retain jurisdiction over the matter. After such a referral, it may be argued that any order of the ICC would then be within the exclusive jurisdiction, for initial review, of the district court that referred the matter to the ICC under 28 U.S.C. § 1336(b). *See City of New Orleans v. Southern Scrap Material Co.,* 704 F.2d 755 (5th Cir.1983); *Railway Labor Executives' Ass'n v. ICC,* 894 F.2d 915 (7th Cir.1990). Even if those precedents are accepted as prevailing authority, however, their applicability in the present circumstances is in doubt.

First, the ICC has indicated that it might not be willing to accept a reference by this court of the dispute over interpreting and applying the distinction between "commercial location" and "residence." Second, in each of the cited cases the stay order that was later treated as a referral had originally been entered *before* the entry of the ICC order to be reviewed under § 1336(b). Thus, it was more plausibly stated in those cases than it can be stated in this case that the ICC order was one "arising out of such referral"—a phrase that appears in § 1336(b).

## VIII.

Appellate review in a court of appeals will, of course, be essential to final resolution of this and many other issues of unsettled law that place the parties, this court, and the ICC in circumstances likely to absorb substantial time and resources before a final determination of this dispute.

One of my objectives at this time is, if efforts at alternative dispute resolution are not successful, to seek a route to authoritative resolution of decisive issues by higher authority as expeditiously as possible.

With this aim in view, I will encourage either or both parties to take an immediate appeal from my Declaratory Orders. Also, I will be prepared to consider with counsel for both parties whether the likelihood of acceptance of an appeal can be improved by a supportable certification by this court (or by the ICC if it is persuaded to make such a certification), made on authorized grounds, that it is in the public interest and in the interest of the parties that a higher court accept an immediate appeal from one or more orders, even if interlocutory in nature.

## IX.

If an immediate appeal by one or both of the parties and this court's certification under 28 U.S.C. § 1292(b) are accepted by a higher court and that court determines that this court committed error in determining that it lacks authority to "refer" this case to the ICC, perhaps that court will also conclude that decisionmakers (in all the many forums involved in this matter) should look through form to substance and determine either:

(1) that this court had made, before Chadwick's filed its petition with the ICC, the functional equivalent of an order of reference to the ICC; or

(2) that the orders of this court made at the present time are the functional equivalent of a retroactive order of reference to the ICC; or

(3) that the orders of this court made at this time are the functional equivalent of effective judicial review of at least a part of the ICC's decision of June 16, 1995 (that part in which it declined to decide tariff applicability issues) and also have the effect of a remand to the ICC for further proceedings accordingly.

If an immediate appeal is not taken or is rejected by a higher court, perhaps the ICC will be persuaded that, absent any guidance or direction, one way or the other, from a higher court, it should look through form to substance and treat this court's orders as stated in (1), (2), or (3) above.

If any of these outcomes occurs, this case may be rescued from the necessity of added delay, expense, and confusion that might otherwise result from uncertainty about how to proceed to final resolution.

## ORDERS

For the reasons stated in the foregoing Opinion, it is ORDERED:

 **567**

1. Chadwick's Objection to and motion for reconsideration (Docket No. 182) of Magistrate Judge Karol's Order (Docket No. 169) dismissing Chadwick's motion for stay as moot are overruled and denied, and Chadwick's motions for stay (both as previously filed and currently renewed) are denied.

2. Chadwick's Motion for Summary Judgment (Docket No. 163) is denied.

3. By separate order, this case will be referred to Senior Judge David Mazzone, Administrator of the Court's Alternative Dispute Resolution Program.

4. A conference regarding an Order Regulating Proceedings in this case in this court, absent settlement, is set for 4 p.m., October 24, 1995. The court directs that the parties file jointly a proposed Order Regulating Proceedings if they can do so. Otherwise they are to file their separate proposals at least two court days before the conference.

5. The Clerk is directed to enter forthwith, on a separate document, Declaratory Orders as follows:

(a) The issue of rate applicability raised in this case is within the primary jurisdiction of the Interstate Commerce Commission. Accordingly, this court declines at this time to proceed to rule on this issue.

(b) Because of the complicated issues of jurisdictional law implicated by the doctrine of primary jurisdiction and because of the possibility of conflicting decisions in this case by two different United States Courts of Appeals, the findings and orders contained herein are particularly appropriate for immediate review by the Court of Appeals for the First Circuit. Accordingly, the decisions of this court—that the issue of rate applicability raised in this case is within the primary jurisdiction of the ICC and that this court declines at this time to rule on this issue—are made as part of this court's Declaratory Orders here stated.

(c) This court determines, under 28 U.S.C. § 1292(b), that this court's Declaratory Orders, stated above, are premised on a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from this court's Declaratory Orders may materially advance the ultimate termination of the litigation.